THE BECKER STEAMSHIP CO. *v.* SNYDER, A MINOR.

(Decided February 11, 1929.)

*Messrs. Holding, Duncan & Leckie,* for plaintiff in error.

*Mr. James M. McSweeney,* for defendant in error.

VICKERY, J. This cause comes into this court on a

petition in error to the common pleas court of Cuyahoga county. In the court below the defendant in error, William Snyder, was plaintiff, and through his next friend recovered a judgment in the sum of twenty thousand dollars against the Becker Steamship Company, the plaintiff in error here, and it is to reverse that judgment that the proceedings in error are prosecuted.

Several errors are alleged why this judgment was wrong and why it should be reversed. We have gone over this record and the very carefully prepared briefs of both sides, and have heard very able arguments on both sides, and from all these sources we learn that Snyder was a young man about 18 years old, a student in one of our schools; that his father was dead; that he was living with his mother and stepfather; that for the purpose of earning money for his next year's tuition he procured employment as a deck hand on the steamer W. H. Becker, one of the boats owned by the defendant company, for the season of 1926—that is, from early in May until September; that he had similarly been employed the previous year; that on the voyage which terminated so disastrously for the plaintiff below the ship W. H. Becker carried a cargo of coal from Toledo to Superior City; that when the ship reached Superior City, where the coal was to be unloaded, it was unloaded with the use of machinery and clams used for that purpose; and that as a result coal, slag, and dust had dropped from the clam and was between the coamings surrounding the different hatches. This boat had 30 hatches, and there was a space of 2½ feet between each hatch and the coam-

ings surrounded the opening into the hole below, which coamings were about 10 inches high.

The evidence shows that quite a lot of coal and slag had fallen between the hatches, and, according to one of the witnesses, it was the first time after unloading coal that they went to the ore docks to get a load of ore without cleaning the deck; but on this occasion, for some reason or other, the deck was not washed and the coal and other matter was between these coamings surrounding the hatches. After the coal was unloaded the ship was moved over to the ore dock, and the starboard side of the ship was placed next to the dock. In loading the ore they used only the starboard half of the hatches, and the port end of each hatch was to be covered, and when this injury occurred they were engaged in covering these hatches. The port end of No. 12 hatch had been covered and they were working on No. 11 hatch.

The work of Snyder at this time was between hatch No. 11 and No. 12, to guide the cable, for the cable was fastened to the cover of the hatch, and by means of the winch on the deck and a block fastened to the port side of the vessel, the port end of the hatch was covered. As already stated, the ore was loaded into the hold of the vessel from one end of the hatch only; that is, in this instance the starboard end of the hatch. The boat being a very long one, some 600 feet, the loading machinery on the dock being stationary, the boat had to be wharfed alongside of the dock many times in order to have the bucket, carrying the ore from the dock to the hold, placed directly over the hatches. The evidence shows the

nature and character of the bucket and the method of using it and getting it over the various hatches in which from time to time the men wanted to deposit the ore, for if the boat was to be kept in proper condition, they could not fill a hatch entirely and then move to another. They had to wharf the ship back and forth—in this case 60 to 90 times during the loading of the boat. They started in the stern of the boat and had just drawn on the port cover to No. 12 hatch and were working on covering the port side of No. 11 hatch, when this injury occurred.

Now, the evidence shows that this machine that was used to transport the ore from the dock and to the boat consisted of cables, pulleys, and a bucket, which was very large and very heavy, and it was frequently necessary to oil and grease the pulleys, at least, and other machinery employed in conveying this ore to the boat. There was a place on the dock where they could grease the ore bucket and the pulleys on the same. But there is evidence in the record to the effect that men came on board the boat and used a five-gallon can of oil, and they swabbed the block and pulleys, and perhaps the cable, with this oil, and it was necessary for the proper working of this machinery that it should be frequently oiled and greased.

Now, it must be remembered that this piece of machinery swung across the deck over the hatches, not only once, but scores of times, in loading and unloading this boat. It is important to have this in mind for its bearing upon what resulted in this lawsuit.

A petition was filed setting up the carelessness

and negligence of the owners of the boat in having coal on the deck. On that day it had been raining, and the deck, being of steel, was slippery with the coal on it. But ultimately plaintiff amended his petition and alleged that there was grease and oil between hatches 11 and 12, which caused the plaintiff below to slip and fall into No. 12 hatch, and the importance of this is that counsel for the steamship company submitted a special inquiry to the jury, which was as follows: "Did William Snyder slip upon oil or grease upon the deck of the Steamer, William H. Becker, as a result of which he fell into the hold of the vessel?"

The answer to this inquiry was that he did. Now, error is prosecuted from that, and it is claimed that upon this answer the court should have granted the motion for a verdict for the defendant, or, rather, a judgment for the defendant notwithstanding the verdict, because, it is alleged, there is not any evidence in this record to show that there was any grease or oil at this particular place where this injury occurred.

Now, we take it that juries are composed of men and women of experience, and they know something about the construction of an ore-carrying vessel. I presume they all know that the deck is made of iron or steel; that it is rounded; that a boat having 30 hatches is a long boat; and if a boat is to be wharfed back and forth, with machinery extending over it, which has to be oiled frequently, it is easily deducible, as a matter of fact, that there was oil and grease, not only at this place, but at other places, upon that deck. So the matter becomes very material.

384

For some reason the captain of this boat was not called, but the captain of another boat was used to establish the manner and method of unloading boats generally.

There is evidence that this was the first time that the deck was not properly washed and the coal and slag not cleaned up from the deck. The boatswain testified as to the unwashed condition, and that there was coal and slag between the hatches. The evidence shows also that this coal and slag on a wet deck would become very slippery and dangerous. It is manifest that the steamship company in not cleaning this deck was careless and negligent in providing for the safety of its workmen. But it is argued with much force that this was just as apparent to Snyder as it was to others, that he could see that this deck had not been properly cleaned and when he undertook to work on that uncleaned deck he assumed the risk, and that, the action being brought under the Jones law, the assumption of risk is a defense to a right to recover.

So, now, the negligence of the steamship company having been proven in this case beyond peradventure of doubt, in that it did not wash the coal and refuse off this boat after the coal had been unloaded, contrary to the usual custom, before they undertook to fill the hatches with ore, it becomes a question as to how fully the plaintiff below understood this danger. He was working under the direction and the immediate supervision of the boatswain and other men who had much more experience on the boats than he, and they did not demur, and went along working with him on this coal covered deck, and, apparently, they did not appreciate the danger

any more than he. That there was danger, whether caused by the coal and unwashed condition of the deck, or because of oil or grease, must be apparent.

Now, it is interesting to note plaintiff in error's answer in this case with respect to the assumption of risk, and its theory of the defense in this lawsuit. They seem to make their whole case upon the fact that Snyder got upon that part of hatch No. 12 which had been covered, and from that covered portion of the hatch fell into the hold and was injured, and the evidence to sustain that is given by the operator of the machinery on the dock which transported the ore from the dock to the hold of the vessel, and this man was sitting where it was difficult for him to see because he was quite a distance from the accident. In addition to this they have a statement of the buddy of Snyder, I believe, to the effect that Snyder was working between hatch No. 11 and hatch No. 12, and "stepped up to the port side of hatch No. 12," to use his own words, and they assume from that that he stepped upon the covered portion of hatch No. 12 and fell from that into the hold.

There is abundance of evidence to sustain the theory of the plaintiff in this lawsuit that he fell, not from the port end of hatch No. 12, which was covered, into the hold, but that he slipped and fell into the hold from between hatches No. 11 and No. 12 where he was standing. Now, of course, there was a coaming 10 inches high, which ordinarily would keep persons from slipping into the hatch, but if he stepped upon a piece of coal, especially if there was grease on it, and that piece rolled under his feet, it might well throw him so that it would seem as

though he was falling through the air into the hold, as was testified to by two or three persons who saw him.

Now, coming back to the assumption of risk on the basis of the defendant's answer, it all seems to apply to getting upon the hatch cover. There is evidence in the record that this boy and the others were to keep off the hatches, and that if they did keep off the hatches they would not fall into the hold, and the theory of the defendant in this lawsuit was that Snyder fell from the covered end of the hatch into the hold, and therefore, in spite of the warning, assumed the risk in getting upon that hatch. Now, if we would have to decide this question upon the weight of the evidence, as to where this accident occurred, whether Snyder fell from the hatch, or from *between* hatches No. 11 and No. 12, we would be compelled to come to the conclusion that he fell from between hatches No. 11 and No. 12. But, under the circumstances, did this young man *fully* understand and appreciate the danger? Did he assume the risk under the circumstances? Is there any evidence, or any facts, from which a deduction can be made about the presence of oil or grease, which would make it still more slippery; but irrespective of oil and grease, the boatswain and other witnesses testified that it was exceedingly slippery.

Now, remember this young man was working on a ship, and if there is any place in the world where orders are to be obeyed, it is upon a ship. The captain and the officers in charge are in supreme command, and to refuse to obey a legitimate order is more or less sufficient cause to be placed in irons, and to

be carried to port in irons, for refusing to obey a lawful order. So when this young man was acting under directions of the boatswain, the man in charge of the deck and the covering of the hatches, he was acting under an immediate, if not a peremptory, order of his superiors, and he had no option but to obey the order, and apparently he was not the only one who did not fully appreciate the danger, because the other men worked along there likewise and apparently were not hurt. So the danger was not so imminent; it was not so certain that a man would be injured if he worked there and assumed the risk incident to the duties he was hired to perform.

Now, as already stated, this young man fell into this hold and was injured and mangled in a horrible manner; his back was broken in three places, according to one medical man; his arm was broken; his forearm was bent right back and his fingers and his leg were broken; and he was in a horrible condition and was permanently crippled; and, as we understand it, there is no compensation under the compensation laws in such cases. Consequently, unless the young man can recover for the injuries sustained, he will be a hopeless cripple without any hope or expectation of getting any damages or other compensation for his injuries. Of course, we do not believe that men should be mulcted in damages just because somebody is hurt; there must be a foundation for it; but we think the record in this case shows that the owners of this vessel, through the captain and others in charge, were grossly negligent in not washing down this deck and cleaning it after they finished unloading the coal, as they always had done,

and we think the presence of the coal and other stuff that was on this deck, making it slippery, was the proximate cause of this injury.

It is not seriously claimed that the verdict is excessive, because, judging from other judgments that have been sustained for injuries less than those in the case at bar, this judgment seems to be a comparatively small one.

Now, it is claimed that the court erred in refusing to give certain charges that were requested before argument. The court did substantially give them, with a correction which the attorney in open court admits should have been in his request to charge, and that was the insertion of the word "fully,"— did the plaintiff "fully" understand the dangers resulting from the uncleaned conditions of the deck when he went in there to work. The court substantially covered all the points that were raised by the defendant, and gave, in our judgment, a very clear, concise, and comprehensive charge, fair in every detail to the plaintiff in error and to the plaintiff below.

The question was fairly and squarely submitted to the jury as to the condition of this boat, and whether there was any grease or oil on the boat, and whether this young man fully understood the nature and danger that he was working under; and, in addition thereto, was the special finding already referred to, where the jury specifically found that there was oil and grease at this point that tended to cause this injury? As already stated, the argument made against that is that there was no evidence. We think a scanning of this whole record will show

that there is ample evidence from which a jury or any sane person might rightfully come to the conclusion that the oil and grease had dripped between hatches Nos. 11 and 12, as it had between other hatches on that steamship, and therefore we do not think that the court erred in not granting the motion of the plaintiff in error, defendant below, for a judgment on the special finding of the jury or on the fact that there was no evidence to sustain such a finding. The jury did not, as a matter of fact, find that this was the *only* proximate cause of that injury. It was a contributing cause. Perhaps if there had been no coal, and if it had not been raining, the oil that was there upon that boat would not have been sufficient to precipitate this young man to the bottom of the hold. All things taken together, the rainy day, the coal, the rain itself on the deck, would make it difficult to say whether there was any grease or oil mixed with the coal, but all taken together as one whole were undoubtedly the proximate cause of this injury, and it all might have been prevented had those in charge of the steamship taken the precaution that they always had taken theretofore and washed down the deck and taken off the coal. Instead of doing that at this particular time, the men were ordered to do painting, and the plaintiff in error left the deck in that filthy condition, and asked and compelled its men to work under those conditions, and under the circumstances we think the jury were justified in coming to the verdict that they did.

We do not see any error in this record that would warrant us in disturbing it, and the judgment will therefore be affirmed.

*Judgment affirmed.*

SULLIVAN, P. J., and LEVINE, J., concur.